UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DEMETRIC SMITH,

     Plaintiff,

v.                                                    Case No. 3:19cv3746-MCR-HTC

SANTIAGO, et. al.,

     Defendants.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Demetric Smith, proceeding *pro se* and *in forma pauperis*, initiated this action by filing a complaint under 42 U.S.C. § 1983. ECF Doc. 1. On December 30, 2019, the Court reviewed the original complaint and determined it failed to state a cause of action. ECF Doc. 7. The Court therefore gave Smith an opportunity to file an amended complaint. *Id.* This matter is now before the Court for review under 28 U.S.C. §§ 1915A, 1915(e) on Smith's amended complaint (ECF Doc. 8). Upon careful review, the undersigned respectfully recommends this action be dismissed pursuant to 28 U.S.C. § 1915A(b)(1) and § 1915(e)(2)(ii) for failure to exhaust and failure to state a claim.

## I.     BACKGROUND

Smith is an inmate of the Florida Department of Corrections ("FDOC"), currently incarcerated at Santa Rosa Correctional Institution ("SRCI").  ECF Doc. 8.  Smith sues five SRCI employees:  Warden Clemmons, Assistant Warden Santiago, Head of Institution Classification Barlow, Classification Officer Tucker, and State Classification Officer Diggman.[1]  The crux of Smith's complaint is that the Defendants have violated his Eight Amendment right against cruel and unusual punishment by failing to place him in protective management.[2]

Smith claims he needs protective management because he was part of a drug transaction in the prison, involving gang members and an officer, that went bad.  As a result, Plaintiff alleges that hits have been placed on his life by gang members.  Plaintiff sought protective management, and, on January 15, 2020, Defendants Santiago and Barlow advised him that he would be placed in protective management in ninety (90) days and agreed to place him in a single cell in the interim.  ECF Doc. 8 at 9.  Plaintiff is currently classified in Close Management III ("CM III") status (for a prior assault on another inmate).

---

[1] Other than Santiago and Tucker, none of these defendants were identified in the initial complaint. ECF Doc. 1.

[2] Protective management is "a special management status for the protection of inmates from other inmates in an environment as representative of that of the general population as is safely possible." Fla. Admin. Code r. 33-602.221(1)(j).

Plaintiff complains, however, that because of the fear for his safety, he will not be able to leave his cell during those 90 days. He further argues he will not be able to participate in exercise activities or rehabilitative programs. Thus, Plaintiff seeks a "preliminary injunction be granted to ensure Plaintiff's safety" and that he be removed from SRCI and placed in protective management. *Id.* at 12.

Smith's amended complaint sets forth the factual allegations that follow, which are accepted as true for purposes of this review under 28 U.S.C. § 1915A, §1915(e).

### A. The Drug Deal

In July 2019, while Smith was housed in B-dorm, another inmate by the nickname of "Blackboy" told Smith that Blackboy's roommate, Li Joker (who was a MS-13 gang member), had "$500" and two ounces of K-2. *Id.* at 6. Smith gave Blackboy and Li Joker the address for Natasha Powell, an approved visitor on Smith's visitation list, to use to overnight the drugs. Powell notified Smith when the K-2 arrived and asked for someone to come pick it up. Hours later, Powell sent Smith a text message on Li Joker's phone, which stated: "a girl just came and got that for (dude) who works there." *Id.* The "dude" she was referring to was Officer J. Oliver (who is not a named defendant in the amended complaint).

Smith told Li Joker the K-2 had been picked up and would be brought to Smith by Officer Oliver and Li Joker gave $500 to Smith for Officer Oliver. Smith gave

the $500 to Officer Oliver when he came through laundry, and Oliver told Smith it would take a little time for him to bring Smith the K-2 because "things were hot." ECF Doc. 8 at 6.  Smith then told Officer Oliver the money and drugs were not his, he would just be getting half an ounce of the K-2, for making sure the deal went through, because the rest of the K-2 was going to be divided among Blood Nation, MS-13, and Folk Nation gang members.  *Id.* at 6-7.

In August 2019, Officer Oliver told Smith that "his workers (inmates who work laundry)" had been caught with one of the ounces of K-2 and cell phones and that he could not bring the other ounce because Sgt. Cade "had snitched him out." *Id.*  Smith told Blackboy, who told Li Joker of the situation.  Later that day, Li Joker killed Blackboy.  Smith claims the reason Blackboy was killed was because Li Joker thought Blackboy and Smith were "trying to play him and the rest of the . . . gang-nations out of the money and drugs." *Id.*

Smith claims four (4) high-ranking gang-leaders, Brandon Neily (Blood), Terrance Bernett (Folk Nation), Willie Dennis (Blood) and Juan Vegas (MS-13), have issued a "state-wide hit" on him through their "hitters," who are low-ranking gang members.  *Id.*  Smith claims "every dorm" at SRCI is full of hitters.  *Id.*

## B. The Grievances

Smith attached two inmate grievances and two ICT Hearing reports to his amended complaint and alleges these show that every defendant allegedly had the

authority to recommend him for placement in protective management, but none chose to do so. ECF Doc. 8 at 7. The first grievance is dated December 16, 2019 and is a Request for Administrative Remedy or Appeal to Warden Clemmons. Smith begins the grievance with "this grievance is in reference to Case #319cv3746-MCR-HTC," and claims that since the Court granted his motion to proceed *in forma pauperis,* two of his approved visitors (including Powell) and his family have received threatening texts "from inmates (Bloods, MS-13's) here and throughout [the] FDOC." ECF Doc. 8 at 16. Plaintiff states that he is up for CM-3 review in January and that he is "to either be stabed (sic) or possibly killed due to this court case." *Id.* He wrote that he is in fear of his life and asked to be "screened and review[ed] for placement in a protective management housing unit." *Id.*

On January 3, 2020, the grievance was approved to the extent that Smith's request for protective management was referred to the Chief of Security. Smith was advised that an ICT would consider his request and he should anticipate a review within two weeks. The grievance response, which was signed by Defendant Assistant Warden Santiago, also stated that "the final review and approval authority is the state classification officer." ECF Doc. 8 at 15.

Also, on January 3, 2020, Defendant Tucker delivered Smith's close management recommendation "I.C.T. [h]earing papers" to him. *Id.* at 8. After realizing he was being recommended for CM III status and not for protective

management, Smith "advised" Officer Jacobson (who is not a named defendant) about "the safety and danger of [his] life and also the grievances if he could show Classification Officer Tucker." ECF Doc. 8 at 8. Jacobsen told Smith that Officer Tucker said that "there is nothing she can do." *Id.* Thus, Smith alleges Defendant Officer Tucker failed to recommend that he be placed in protective management and "didn't take reasonable measure[s] to guarantee the safety of Plaintiff." *Id.*

A copy of the FDOC Report of Close Management ICT[3] Hearing is attached to Smith's amended complaint. ECF Doc. 8 at 17. A review of the Report shows that Smith was approved for "CM I status" on January 11, 2019 "for an act causing injury or an act which could have resulted in injury to another." *Id.* Specifically, Smith was observed on fixed wing camera striking another inmate with a homemade weapon that resembled a lock in a sock, which resulted in injuries so severe that the injured inmate had to be sent to an outside hospital. *Id.* Smith was downgraded to CM II status on July 15, 2019. And, on January 3, 2020, the ICT team, chaired by Defendant Assistant Warden Santiago and attended by members Defendant Barlow and a B. Oakes, recommended his classification be reduced further to CM III status. *Id.* The Report was reviewed by Defendant Tucker.

On January 9, 2020, Smith filed a second Request for Remedy or Appeal to the Warden. Smith alleges this grievance was "returned without action" and claims

---

[3] ICT refers to Institutional Classification Team. *See* Fla. Admin. Code r. 33-601.800(1)(k).

Defendant Warden Clemmons "never respon[d]ed to any of Plaintiff's grievances which were directed to him."  ECF Doc. 8 at 8.

A review of the attached response shows that it was returned without action because Smith's "request for protective management is currently under review at the institutional level."  *Id.* at 13.  Additionally, a copy of the grievance was forwarded to the officer that will be investigating Smith's request for protective management. Smith was also advised in the response that "upon notification of the state classification office's final decision, if your request for protective management is denied you will have the opportunity to appeal that decision directly to the office of the secretary within 15 days of the state classification office's decision."  *Id.*  The grievance response was signed by Defendant Assistant Warden Santiago.

Based on a FDOC Report of Close Management ICT Hearing, also attached to the amended complaint, dated January 9, 2020, it appears that ICT interviewed Smith again on that date for his close management review.  *Id.* at 18.  The results of the review were that ICT recommended Smith be reduced to CM III status with a 90-day review.  *Id.*

Smith alleges he was advised of this recommendation on January 14, 2020, by Defendant State Classification Officer Diggman.  Smith told her about "the harm and risk to [his] safety" and showed her his "approved grievance [and] the grievance returned without action."  *Id.* at 8-9.  After noticing that the "approved grievance"

mentioned "the state classification officer (meaning . . . Diggman)" had "final review and approval authority," Diggman stated "that a[t] no time was she aware of such a request concerning [Smith's] safety and if any of the named defendant(s) would have recommended [Smith] for a placement in a 'Protective Management Housing Unit' knowing the serious risk that it places an inmate in by [them] not being handcuffed sometimes then she would have went with the recommendation for 'Protective Management Housing Unit' but neither of the named defendant(s) made her aware of the problem." *Id.* at 9.

### C. The Protective Management Hearing And Decision

On January 15, 2020, a protective management hearing was held, and Defendants Santiago and Barlow were in attendance. At the hearing, Smith stated the following in support of his placement in protective management. First, the K-2, crystal meth, and cellphones confiscated from Officer Oliver's laundry workers were supposed to go to "the named inmates in [his] grievances as well as witness statement [and] both defendant(s) agreed about knowledge of this occurring." ECF Doc. 8 at 9. Second, he testified "about the drugs that were being mailed to the institutions law library through UPS and FedEx Postal Service" and that he helped inmate Terrance Bernett purchase drugs from inmate Donald Rozier and both defendants "had knowledge of the contraband being found." *Id.* Third, he "stated to the defendant(s) of why" Blackboy's death was related to the K-2 being found by

officers conducting a search of Officer Oliver's laundry workers and gave them details about his transaction with Officer Oliver and the use of Powell's address. *Id.* at 9-10. Smith also told Santiago and Barlow he was "concern[ed] for [his] safety" and that he is "not allowed to go attain both adult basic education and the compass 100 live program due to the 'World Wide Hit'" placed on his life. *Id.* at 10. Additionally, the " 'hitters' gang members of their nations (Blood Nation) and (Folk Nation)" have been told to " 'shot (sic) [Smith] on sight,' meaning that once [he] leave[s his] cell and they get a chance to 'stab [him].' " *Id.* at 10.

After discussing Smith's case, Defendants Santiago and Barlow told Smith "the best they could do" was keep Smith "housed alone," and after (90) days they would recommend for him to be transferred to a Protective Management Housing Unit. *Id.* Smith nonetheless complained about being deprived of his rights to go to educational classes and the exercise yard because of the "worldwide hit" that has been placed on his life. Both Defendants stated, again, that after ninety (90) days Smith would be transferred, "but the best they could do was keep [Smith] housed alone." Smith continued to complain that this means for the next ninety (90) days he will "live in fear inside of [his] cell and not be able to come [out] because of these inmates." *Id.* at 10-11. Santiago and Barlow reiterated that "they were sorry but this was the best they could do but would recommend and see that [Smith] be transferred to a 'Protective Management Housing Unit' in (90) days." *Id.* at 11.

### D. Smith's Claims And Relief Sought

Smith alleges "the named defendants" while acting under state law "are aware and have knowledge of Plaintiff risk and the seriousness of Plaintiffs' safety but fail to exercise the power of their official positions to recommend Plaintiff's transfer to a 'Protective Management Housing Unit.'"    ECF Doc. 8 at 11.    Additionally, he asserts "if such a recommend[ation] was requested by the named defendant(s) then State Classification [Diggman] who has the final review and approval authority would have granted such a request."  *Id.* at 11.

Based on these factual allegations, Smith claims Defendants violated his: "[r]ight to safe conditions in prison. (Basic human need exercise, Rehabilitative Programs, and protection from violence at the hands of other prisoners. (Eighth Amendment.)."  *Id.* at 12.  As relief, Smith seeks "[t]hat a Preliminary Injunction be granted to ensure Plaintiff's safety will the Honorable Court consider Plaintiff's case.   And that Plaintiff be removed [from SRCI] and placed in a 'Protective Management Housing Unit.'"  *Id.*

## II.    LEGAL STANDARD FOR SCREENING

Under 28 U.S.C. § 1915A, because Smith is proceeding *in forma pauperis* and is a prisoner seeking relief against governmental employees, this Court must review Smith's complaint, identify cognizable claims and dismiss the complaint, or any portion thereof, if the complaint "(1) is frivolous, malicious, or fails to state a claim

upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(a), (b); *see also* 28 U.S.C. § 1915(e)(2)(B) (applying the same standard to *in forma pauperis* proceedings). In undertaking this review, the Court reads Smith's *pro se* allegations in a liberal fashion. *See Haines v. Kerner*, 404 U.S. 519 (1972). Additionally, in determining whether a complaint should be dismissed on screening, the Court applies the same standards for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Mitchell v. Farcass*, 112 F.3d 1483, 1485 (11th Cir. 1997).

## III.    FAILURE TO EXHAUST

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of all available administrative remedies is a mandatory precondition to suit. *See Booth v. Churner*, 532 U.S. 731, 739 (2001).

The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion is required whether the plaintiff seeks declaratory and injunctive relief, monetary damages, or both. *See Booth*, 532 U.S. at 734, 741. The

requirement is not subject to waiver by a court or futility or inadequacy exceptions. *See id.* at 741 n.6.

Moreover, the PLRA requires "proper exhaustion" so that the agency has an opportunity to address the issues on the merits. *Woodford v. Ngo*, 548 U.S. 81, 93-94 (2006); *see also id.* at 95 ("The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievant complies with the system's critical procedural rules."). "Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being hauled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007).

A court must dismiss an action if satisfied the inmate failed to properly exhaust his available administrative remedies before filing suit. *See Higginbottom v. Carter*, 223 F.3d 1259, 1261 (11th Cir. 2000). Additionally, a court may dismiss an action for failure to exhaust under §§ 1915(e) and 1915A if it appears on the face of the complaint that a plaintiff has failed to exhaust his administrative remedies. *See Okpala v. Drew*, 248 F. App'x 72, 73 (11th Cir. 2007) ("[w]here, as here, an affirmative defense appears on the face of a prisoner's complaint, thereby revealing

that the prisoner cannot state a claim, the PLRA continues to require a district court to dismiss the complaint").

In *Jones v. Brock, supra*, the Supreme Court held that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules -- rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones,* 549 U.S. at 200. Compliance with prison (or jail) grievance procedures, therefore, is all that is required by the PLRA to properly exhaust. *Id.* at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").

To exhaust administrative remedies in Florida, a prisoner in FDOC custody must complete the administrative review process established under regulations promulgated by the Secretary of the FDOC.  Fla. Stat. § 944.09(1)(d) ("The department has authority to adopt rules... to implement its statutory authority. The rules must include rules relating to... [g]rievance procedures which shall conform to 42 U.S.C. § 1997e.").  Under the administrative review process established by the Secretary of the FDOC, a prisoner generally must: (1) file an informal grievance with a designated prison staff member; (2) file a formal grievance with the warden's office; and then (3) submit an appeal to the Secretary of the FDOC. *Chandler v.*

*Crosby,* 379 F.3d 1278, 1288 (11th Cir. 2004) (citing Fla. Admin. Code § 33-103).

A prisoner, however, may proceed directly to the formal grievance process to

challenge placement in close management (Fla. Admin. Code § 33-103.005) or

directly to the Secretary to submit a grievance about protective management.[4]

As discussed in Section I.B., above, Smith initiated his administrative

remedies by filing a formal grievance directly with the Warden.  ECF Doc. 8 at 14,

16.  Smith, however, did not file that grievance until *after* he initiated this action.

Indeed, in both the December 16, 2019, formal grievance and the January 9, 2019

formal grievance, Smith references the filing of this action and states that he is filing

the grievances "in reference to" this action and cites it by number.  Since Smith did

not file a grievance seeking protective management (the issue complained of in this

suit), until after he had already filed suit in October 2019, he cannot proceed with

this action.

Moreover, according to Plaintiff's allegations, a hearing on his protective

management request was held on January 15, 2020, and he was advised that day that

he would remain in CM III status, but housed in a single cell, and would be

---

[4] However, a prisoner may bypass the first two steps in the case of "[e]mergency grievances and grievances of reprisals, [and] protective management," among others.  Fla. Admin. Code r. 33-103.007(3)(a). A prisoner permitted to bypass the first two steps may proceed directly to the third step by filing a grievance with the office of the Secretary of the FDOC.  *See id*. When a prisoner files a grievance directly with the Secretary's office, he must do so "within 15 calendar days from the date on which the incident or action which is the subject of the grievance occurred."  Fla. Admin. Code Ann. r. 33-103.011(d).

transferred to protective management in 90 days. In the Institution's January 10, 2020 response, Plaintiff was advised he has fifteen (15) days after notification of the state classification officer's final decision regarding his request for protective management to file an appeal to the Secretary. ECF Doc. 8 at 13. At the time Plaintiff's amended complaint was docketed on January 22, 2020, his time for appealing the decision to the Secretary had not expired. Thus, it appears that Plaintiff may still be in the process of completing his administrate remedies (or failed to complete them). Either way, this suit is premature and is subject to dismissal for that reason.

## IV.    DISCUSSION ON THE MERITS

Because the Court is to review Plaintiff's complaint liberally, and out of an abundance of caution, the undersigned also considered the merits of Plaintiff's allegations and finds that, even if Plaintiff had exhausted his claims, they are still subject to dismissal.

### A. Failure To Protect

As stated in this Court's December 30, 2019 amend order, "the Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994))

(alterations and internal quotation marks omitted).  This includes a duty to protect prisoners from violence at the hands of other prisoners.  *Farmer*, 511 U.S. at 833.

"A prison official violates the Eighth Amendment when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk."  *Caldwell*, 748 F.3d at 1099 (emphasis and internal quotation marks omitted).  "To prevail on such a claim brought under § 1983, the plaintiff must show: (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) a causal connection between the defendants' conduct and the Eighth Amendment violation."  *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015).

In this case, Plaintiff's allegations do not state a failure to protect claim because he has not alleged any facts to show that he faces a substantial risk of serious harm in a single-cell housing unit.  Although Plaintiff alleges hits have been placed on his life by gang members, Plaintiff is not currently housed in the general population.  Instead, Plaintiff is currently classified in CM III, and Defendants Santiago and Barlow have told Plaintiff they will keep him in a single-cell unit and will transfer him to protective management at the end of the 90 days.

Because Plaintiff has already been approved for protective management, which would otherwise moot this case,[5] Plaintiff would be entitled to relief only if he can allege facts to show that he needs protective management sooner than 90 days. However, in his amended complaint, Plaintiff does not complain that a single-cell unit is insufficient to keep him safe from the gang members. *See Quilling v. Humphries*, 2011 WL 2650001, at *4 (N.D. Fla. May 11, 2011) ("It is also noted that at the time [Plaintiff] made these complaints, he was already housed in administrative or disciplinary confinement. Plaintiff presents no facts showing that this housing assignment was not sufficient."), *report and recommendation adopted*, 2011 WL 2637462 (N.D. Fla. July 6, 2011). Instead, after Defendants Santiago and Barlow told Smith they would house him by himself, Smith complained about being not being able to take classes, go to the exercise yard, or go *outside* of his cell.

For the same reasons, because Plaintiff did not complain about a risk of harm to him other than if he leaves his cell, Plaintiff has failed to allege any facts which would give Defendants subjective knowledge that Plaintiff faced a serious risk of harm if he is not immediately transferred to protective management. *See Franklin v. Curry*, 738 F.3d 1246, 1250 (11th Cir. 2013) ("[d]eliberate indifference requires the following: (1) subjective knowledge of a risk of serious harm; (2) disregard of

---

[5] "If events that occur subsequent to the filing of a lawsuit . . . deprive the court of the ability to give the plaintiff . . . meaningful relief, then the case is moot and must be dismissed." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (citation omitted).

that risk; (3) by conduct that is more than gross negligence"). Defendants cannot have a subjective knowledge of a risk that does not exist.

Regardless, even assuming Plaintiff could show both a substantial risk of harm and subjective knowledge by the Defendants, Plaintiff's failure to protect claim would still fail because Plaintiff's allegations show that Defendants acted reasonably. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 619–20 (11th Cir. 2007) (citing *Farmer,* 511 U.S. at 844). More succinctly, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Id.* (citing *Farmer* at 845).

Based on Plaintiff's factual allegations, Defendants took reasonable steps to protect him by agreeing to house him in a one-man cell and transferring him to protective management in 90 days. *See Goodwin v. DeSpain*, 2018 WL 2946420, at *6 (S.D. Ala. Mar. 7, 2018) ("Defendants were aware of [Plaintiff's] enemies and their potential harm to Plaintiff, and Defendants acted reasonably in housing Plaintiff in segregation away from the risk of serious, known harm."), *report and recommendation adopted*, 2018 WL 2944158 (S.D. Ala. June 12, 2018). Additionally, after receiving Plaintiff's initial December 2019 grievance, the institution considered his request for protective management and held a hearing on

January 15. Thus, there are no facts alleged showing that Defendants have responded unreasonably to a known risk to Plaintiff. *See e.g., Rodriguez*, 508 F.3d at 614-16 (remanding for district court to determine whether prison official responded reasonably when a plaintiff requested protective management and transfer based on threats to his life, yet the official recommended he be released into the general population); *Dunston v. Churchwell*, 2019 WL 3558195, at *4-6 (N.D. Fla. July 5, 2019) (finding no deliberate indifference where plaintiff alleged a hit had been placed on his life, the plaintiff was segregated in disciplinary confinement, his grievance was referred to the security department, and he was eventually released to the general population), *report and recommendation adopted*, 2019 WL 3557883 (N.D. Fla. Aug. 5, 2019), *appeal dismissed sub nom. Dunston v. Kelly*, 2019 WL 6460847 (11th Cir. Oct. 7, 2019).

Plaintiff's failure to protect claim against Warden Clemmons, Officer Diggman, and Officer Tucker fails for the additional reason that Plaintiff has failed to allege any facts showing any wrongdoing by these defendants. Plaintiff's sole allegation as to Warden Clemmons is that the Warden failed to respond to Plaintiff's December 2019 and January 2020 grievances. Plaintiff's claim fails as a matter of law because no constitutional liability attaches to the Warden's failure to respond to a grievance (even if true). *See Shehee v. Luttrell* 199 F.3d 295, 300 (6th Cir. 1999) (prison officials who were not involved in the alleged constitutional violation, and

whose only roles involved the denial of administrative grievances or the failure to act, are not liable under § 1983 on a theory that failure to act constituted an acquiescence in the unconstitutional conduct)*, cert. denied* 530 U.S. 1264, (2000); *see also Dunn v. Martin*, 178 F. App'x 876, 878 (11th Cir. 2006) (holding that a prisoner has no constitutionally-protected liberty interest in an inmate grievance procedure), *citing Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) and *Flick v. Alba*, 932 F.3d 728, 729 (8th Cir. 1991). Moreover, Plaintiff's factual allegations are belied by the grievance responses attached to his amended complaint because the responses were signed by Assistant Warden Santiago and further indicate that action was taken, including referring the matter to the institution for a protective management review and consideration.

Similarly, although Plaintiff has named Officers Diggman and Tucker in this action, Plaintiff has not alleged any wrongdoing by these defendants. Instead, all the factual allegations as to Officer Diggman show that she helped him. Indeed, Plaintiff alleges that Officer Diggman told him that if she had been made aware of his safety concerns, she would have recommended placement in protective management. As to Officer Tucker, Plaintiff alleges that Tucker delivered to Plaintiff the results of his January 3, 2020, CM review recommendation and that Plaintiff asked Officer Jacobson to show Tucker Plaintiff's grievances. There are no allegations identifying what, if anything Jacobson showed Tucker, and, even if

there were, Tucker responded that there was nothing she could do. Plaintiff has not alleged any facts to show that this is an unreasonable response, particularly since Plaintiff's request for protective management was being reviewed.

## B. Conditions Of Confinement

To the extent Smith seeks to allege a conditions-of-confinement claim against the Defendants because he is being prevented from exercising or attending rehabilitative programs during the 90-day period prior to his transfer to protective management, such restrictions also do not rise to the level of an Eighth Amendment claim. Prison conditions rise to the level of an Eighth Amendment violation only when they "involve the wanton and unnecessary infliction of pain." *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004).

To demonstrate an Eighth Amendment violation based on conditions of confinement a prisoner must show: (1) the condition he or she complains of is sufficiently serious to violate the Eighth Amendment and (2) the defendant prison officials acted with a sufficiently culpable state of mind with regard to the condition. *Chandler*, 379 F.3d at 1289. To establish prong one, a prisoner must show the condition is "extreme" and poses "an unreasonable risk of serious damage to his future health or safety." *Id.* (internal quotation marks omitted).

Plaintiff's inability to attend educational classes or go to the exercise yard, however, is not sufficiently extreme to violate the Eighth Amendment. *See Bass v.*

*Perrin*, 170 F.3d 1312, 1317 (11th Cir. 1999) ("the complete denial to the plaintiffs of outdoor exercise, although harsh, did not violate the Eighth Amendment"); *Dorrough v. Hogan*, 563 F.2d 1259, 1262-63 (5th Cir. 1977) (denial of access to educational programs and restriction on exercise did not constitute Eighth Amendment deprivations)[6]; *Gholston v. Humphrey*, No. 5:12-CV-97-MTT-MSH, 2014 WL 4328239, at *3-4 (M.D. Ga. Sept. 2, 2014) (same as *Dorrough*).[7]

## V.    INJUNCTIVE RELIEF

As relief, Smith seeks an injunction removing him from SRCI and placing him in protective management.  ECF Doc. 8 at 12.  As an initial matter, whether Smith should be transferred from SRCI or transferred to protective management within a shorter timeframe than 90 days is a decision that lies squarely under the purview of prison administration, and this Court should be hesitant to interfere with the administrative processes of a prison.  *See e.g., Brown v. Anglin*, 2016 WL 6803133, at *2 (N.D. Fla. June 27, 2016), *report and recommendation adopted sub nom. Brown v. Holland*, 2016 WL 6780319 (N.D. Fla. Nov. 15, 2016) ("granting the injunction would require the federal courts to interfere in the administration of the

---

[6] Decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.  *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

[7] A complete deprivation by prison officials of all exercise may constitute an Eighth Amendment violation.  *See Lewis v. Escambia Cty. Jail*, No. 3:07CV178/RV/EMT, 2007 WL 1428727, at *3 (N.D. Fla. May 14, 2007).

jail and take over the management or treatment of a single inmate"). Prisoners simply do not have a constitutional right to remain in or be transferred to a correctional institution of their own choosing. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976).

Moreover, to show that he is entitled to a preliminary injunction, Plaintiff must show: (1) a substantial likelihood of success on the merits; (2) that the order is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm that the order would cause to the non-movant; and (4) that the order would not be adverse to the public interest. *Powers v. Sec., Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017). A preliminary injunction is considered an extraordinary and drastic remedy and, as such, is not granted unless the movant clearly satisfies the burden of persuasion as to each of the four prerequisites. *Id.*

In this case, Plaintiff has not shown that he is entitled to a preliminary injunction because he has not shown that he will be successful on the merits and further, for the reasons set forth above, has not shown that such an injunction is necessary to prevent an irreparable harm. *See Cook v. Wilkes*, 2011 WL 5557334, at *2 (S.D. Ga. Oct. 18, 2011) (finding no threat of irreparable harm where prison officials placed plaintiff in administrative segregation, as opposed to protective custody, after alleged threats on his life), *report and recommendation adopted*, 2011 WL 5554019 (S.D. Ga. Nov. 15, 2011).

Finally, even if Plaintiff were seeking monetary damages rather than injunctive relief, he would not be able to state a claim against the Defendants. To the extent Plaintiff sues Defendants in their official capacities, claims for monetary relief would be barred by the Eleventh Amendment. *See e.g., Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994) ("Under the Eleventh Amendment, state officials sued for damages in their official capacity are immune from suit in federal court.").

To the extent he sues Defendants in their individual capacities, Plaintiff is not entitled to compensatory or punitive damages because he has not suffered a physical injury and is not entitled to nominal damages because he has not asserted a constitutional violation. *See Brooks v. Powell,* 800 F.3d 1295, 1307 (11th Cir. 2015) ("an incarcerated plaintiff cannot recover either compensatory or punitive damages for constitutional violations unless he can demonstrate a more than de minimis physical injury"); *Hughes v. Lott*, 350 F.3d 1157, 1162 (11th Cir. 2003) (nominal damages may be appropriate if a plaintiff establishes a violation of a fundamental constitutional right).

## VI.    CONCLUSION

Because Plaintiff is proceeding *pro se*, he was given an opportunity to amend his complaint prior to dismissal. ECF Doc. 7. However, the undersigned simply does not believe that, even with a more carefully drafted complaint, Smith could

state a claim, particularly given his failure to exhaust.  Thus, the undersigned finds that an additional opportunity to amend would be futile.  *Johnson v. Boyd*, 568 F. App'x 719, 723 (11th Cir. 2014) ("[D]istrict court need not grant leave to amend . . . where a more carefully drafted complaint could not state a claim and is, therefore, futile.") (citing *Bank*, 928 F.2d 1108, 1112 (11th Cir. 1991)).

Accordingly, it is respectfully RECOMMENDED, that:

1.    Plaintiff's claims be dismissed under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2) for failure to state a claim.

2.    The clerk be directed to close the file.

At Pensacola, Florida, this 14th day of February, 2020.

*/s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**


<u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations may be filed within 14 days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. A copy of objections shall be served upon the magistrate judge and all other parties. A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. See 11th Cir. R. 3-1; 28 U.S.C. § 636.